IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| MICHELLE ANTHONY and GREG ANTHONY ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No.: 06-RRA-2122-M |
| ) | |
| ALLSTATE INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OF OPINION

This is a civil action filed by the plaintiffs, Greg and Michelle Anthony, against the defendant, Allstate Insurance Company. The action was removed from the Circuit Court of DeKalb County, Alabama to the Northern District of Alabama. The complaint alleges that, after the plaintiffs' home was destroyed by a fire, the defendant wrongly refused to pay benefits due under the plaintiffs' policy of insurance. Two causes of action are alleged: breach of contract and bad faith.

### Standard of Review

In conducting [a summary judgment analysis], [the Court must] view all evidence and factual inferences in the light most favorable to the nonmoving party. *Id.* Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment. *Id.*

*Lofton v. Secretary of Dept. of Children and Family Services,* 358 F.3d 804, 809 (11th Cir. 2004).

**Facts**

The plaintiffs' home, located at 696 Kirk Road, Rainsville, Alabama, was destroyed by two separate fires that occurred on September 19, 2005. The home was insured under an Allstate policy of homeowner's insurance. It was purchased in late 2004 for $200,000. The policy limits on the dwelling is $331,000, and $248,000 on the contents. In their proof of loss, the plaintiffs claimed the policy limits on the dwelling and claimed $181,720 on the contents.

The plaintiffs had lived in and rented the home off and on since 1997 from Dana Jill Simpson. When the plaintiffs bought the home in 2004 from Simpson, Simpson held the mortgage. She later sold the mortgage to Bayview Mortgage.

The fires that are the subject of this lawsuit occurred only four days after Mr. Anthony left his job, which was the primary source of income for the family of five. Mrs. Anthony made $475 every two weeks working as a receptionist at the Cancer Care Center in Ft. Payne. Prior to Mr. Anthony leaving his job, the couple missed payments on routine bills. At the time of the fire, the Anthonys were incurring fees for bounced checks, and their bank account deposits were insufficient to meet the family's monthly expenses. At the time of the fire, the plaintiffs were behind on their payments to Bayview Mortgage on the mortgage loan, which had been taken out approximately seven months earlier.

Mr. Anthony stated that he had several jobs lined up following the loss of his job at Carl Gregory Ford, including working as a musician and doing contract work for P&R Disaster Relief and M&N Auto Carriers. Mr. Anthony stated in his examination under oath (EUO) that he earned $2,500 per week leasing his truck to P&R Disaster relief.

During his initial recorded statement, Mr. Anthony stated that he was a professional musician and had signed a recording contract with SVI Records. He admitted later, however, at a deposition, that neither he nor his band had ever signed a contract with SVI records. In fact, there was never an agreement of any kind with SVI. (Greg Anthony depo. 82.) At his deposition, Mr. Anthony acknowledged that he earned only $6,970 for the entire year of work with P&R. (G. Anthony depo., 119,121).

At his EUO, Mr. Anthony testified that he had never been arrested for any reason. Allstate later discovered that Mr. Anthony had, in fact, been arrested for first degree theft of property. Mr. Anthony admitted at his deposition that his statement about his criminal record was false.

According to Mr. Anthony, on the morning of the fire, his friend, Chris Jackson, came over to help cut down trees, pile shrubbery, and generally clean up the yard. However, the firemen who responded to the fire stated that Mr. Anthony told them that he and his friend were "sweating pipes" that morning.

At around 2:15pm, Jackson and Anthony left the house and went to Burger King for lunch. After spending approximately 30 or 45 minutes there, they returned to the Anthony house. After a couple minutes of conversation, Anthony smelled smoke. Jackson opened the french doors, and smoke came billowing out. Anthony called 911. The call to the fire department came in at 3:22 pm. The fire department arrived, extinguished the fire, and remained at the home until approximately 6:30 p.m. Although friends and family helped remove food, clothes, and a bird from the home, Mr. Anthony stated that he did not remove $8,800 in cash that was in a briefcase in the kitchen. That cash supposedly burned in the second blaze.

Mr. Anthony contends that he set out on the approximately twenty-minute trip to his sister's house to unload the family's collected belongings. After unloading the vehicle and sitting down to eat pizza, Mr. Anthony claims he left to return to the home, which he found fully engulfed in flames. At 7:19 p.m., the fire department again was called out to the home. Assistant Fire Chief Derrick Huskey has testified that the second fire clearly was not a start-up of the first fire.

After a claim was reported, Allstate immediately met with the Anthonys and provided advance payment on their claim. However, Allstate also hired a cause and origin investigator, Troy Ammons. Ammons determined that the fire was incendiary and the result of a human act. Ammons conducted a contents sift, which was analyzed in relation to the plaintiffs' submitted contents inventory. It was concluded that many of the items claimed were not in the home at the time of the fires.

Allstate adjuster Lisa Barkley interviewed several witnesses, and retained attorney Sue Williamson to render an opinion on coverage. Ms. Barkley spoke with several merchants who stated that certain items within the plaintiffs' contents inventory were not purchased at their store as represented.[1]

After fully reviewing the facts and applicable law, Attorney Williamson recommended that the plaintiffs' insurance claim be denied, on the grounds that the fires were caused by arson and that material misrepresentations were made by the plaintiffs in their claims

---

[1] The plaintiffs make no complaint concerning the fact of Allstate's investigation or Allstate's conduct of the investigation. Neither do they contend that anyone at Allstate lied to them or was rude.

submission. After reviewing and analyzing this recommendation, Allstate made the decision to deny the plaintiffs' claim.

### Analysis

*Breach of contract claim*: Alabama law requires the forthright cooperation of the insured during the proof of loss, and specifically addresses misrepresentations as to the proof of loss. The Alabama Code states:

> No misrepresentation in any proof of loss under any insurance policy shall defeat or void the policy *unless such misrepresentation is made with actual intent to deceive as to a matter material to the insured's rights under the policy*.

Ala. Code § 27-14-28 (emphasis added).

In *Ex Parte State Farm Fire & Casualty Co.*, 523 So. 2d 119 (Ala. 1988), the Alabama Supreme Court concluded that §27-14-28 was a clear statutory expression of public policy which establishes that an insurer need not honor or pay pursuant to a contract of insurance where an insured misrepresents material facts to an insurer under the proof of loss coupled with an intent to deceive. *Id.* at 121.

Further, the policy in question contains it own disqualification provision: "We do not cover any loss or *occurrence* in which any **insured person** has concealed or misrepresented any material fact or circumstance." (Emphasis in original). This policy provision requires the denial of coverage where a material misrepresentation is made even *without an intent to deceive*.

The plaintiffs do not deny that Allstate conducted an arson investigation. They merely state that "[t]here has been no . . . proof of arson regarding this claim." (Pls.' Br. 15. Proof of arson is irrelevant to the question whether the plaintiffs misrepresented material facts to

Allstate. But the plaintiffs state at several points throughout their brief that they "did not make any false material misrepresentations to Allstate during the course of its investigation." *Id.* at 15. They further argue that there was no intent to deceive Allstate.

The record, however, shows several misrepresentations during the initial investigation of this claim. First, Mr. Anthony dismissed the loss of his job as a car salesman as a financial motive for arson by misrepresenting that he had several other jobs that would sufficiently replace the lost income. Among these misrepresentations was his statement that Anthony was a musician whose band had just signed a recording contract with SVI Records.

> Q. Okay. What do you do now?
>
> A. Well, I was working at Carl Gregory Ford in Ft. Payne, but I recently left there. Last Thursday (inaudible) I play in a band, *we just signed a two-year record contract.*
>
> \* \* \*
>
> Q. And about how much do you think you make a month?
>
> A. Playing music?
>
> Q. Uh-huh (indicating yes).
>
> A. Well it's fixing to all change. Originally I was making about $2,500.00 with the band. But like I say, we just signed a recording deal, so all that's changing.

(Recorded Statement of Greg Anthony 16.)

At his deposition, Mr. Anthony acknowledged that these statements were false:

> Q. Okay. Where would you have been making twenty-five hundred dollars a month from your music?
>
> A. From the music?
>
> Q. Yes, sir.
>
> A. I don't – I'm not aware that I ever did.

(G. Anthony depo., 82.)

Later he stated:

> Q. Okay. Were there any signed contracts ever sent to SVI?
>
> A. No, sir.
>
> Q. So, you didn't have any signed contract with SVI?
>
> A. Not as a whole total group, no, sir.
>
> Q. Even as an individual, you never provided a contract back to them signed, had you?
>
> A. No, sir, I did not forward my contract signed back to them.

(G. Anthony depo., 82.)

Still later, the following discussion took place.

> Q. So, there was never any agreement with you and SVI, either individually or as a band? There was never any agreeement; is that true?
>
> A. That's right, the deal never went completely through. Yes, sir, that's true.

(G. Anthony depo., 85-56.)

Accordingly, Mr. Anthony undisputedly made two misrepresentations concerning income derived from his work as a musician. First, he was not making $2,500 per month even without a record contract, and, second, there was never any record contract in place as he stated in his recorded statement.

Also, at his Examination Under Oath, Mr. Anthony was not candid about his income from P&R Disaster Relief.

> Q. All right. So when you got angry over your paycheck and you walked out the door, then you effectively lost seven thousand dollars a month income. So my question to you was, what were you going to do to make that up?

A. Well, I've got an F250 that is doing disaster cleanup at P and R that is bringing me in about twenty-five hundred dollars a week. That had already started prior to me leaving there. I knew I had that coming in.

Q. Twenty-five hundred how often?

A. Weekly.

Q. All right. Now, what do you do for that?

A. They use my truck. I mean, I have to keep insurance on my truck. And its through a company called P and R Disaster Relief.

Q. So you get twenty five hundred dollars a week just to let somebody use your truck?

A. Yes.

(G. Anthony EUO, 17-18.)

At his deposition, Mr. Anthony acknowledged the falsity of these statements:

Q. So, it would not be true to say you were earning twenty-five hundred a week every week both prior to and well after this fire from P&R?

A. That's correct.

(G. Anthony depo., 121.) Again, Anthony testified that he made only $6,970 his entire year with the P & R Disaster Relief. (G. Anthony depo., p.119).

As to his contents claim, the plaintiffs demanded $181,720. Ms. Barkley attempted to verify the purchase of several of the more expensive items, including a drum set and a 52" plasma television. (Barkley depo., 54-56.) In conducting her investigation, which included meeting with employees of the stores where the items were stated to have been purchased, Barkley discovered that no record of the purchases existed. (Barkley depo., 54-56.) In addition, Mr. Anthony had filed bankruptcy in 2002 and claimed on his petition only $12,500 in assets. In just three years, Mr. Anthony was claiming over $180,000 in assets lost in the fire at a time when the family had almost no disposable income after paying the

monthly bills. (Williamson depo., 21-23.) Further, the Contents Inventory Investigation conducted by cause and origin investigator, Troy Ammons, concluded that several of the items claimed in the contents list were not in fact in the home. (Exhibit M; Ammons depo. 62-65.)

The plaintiffs have maintained that on the day of the fire Greg Anthony and Chris Jackson were doing work in the yard. The assistant chief of the fire department, Derrick Huskey, stated that he and his men were told that Anthony and Jackson were "sweating pipes" *in the house*. (Huskey depo., 16.) Huskey also stated that he noticed a propane torch in the flower bed as they were leaving from the first fire. (Huskey depo., 27-28.) This torch was later found *inside the house after the second fire*. (Ammons depo., 43.) The plaintiffs point to no testimony that contradicts the firefighters' accounts.

Certainly the plaintiffs' income level, employment status, past criminal history, and conduct before the fire is material to the investigation of an arson claim. Further, misrepresentations concerning the value of the contents of the home are material to the contents claim. Accordingly, it is uncontroverted that the plaintiffs made material claims misrepresentations to Allstate.

The plaintiffs provide no evidence from which it may be inferred that these misrepresentations were innocent misrepresentations. It seems clear that, without evidence indicating the contrary, it must be concluded that the misrepreseantions were made with the intent to deceive, in violation of § 27-14-28. Moreover, the insurance policy itself excludes coverage where material misrepresentations are made *without* proof of the intent to deceive.

Thus, Allstate appropriately denied the plaintiffs' insurance claims under the state statute *and* the terms of the policy.

*Bad faith claim*: The Alabama Supreme Court case of *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179 (Ala. 1982) states the elements of a bad faith claim.

> [T]he plaintiff in a "bad faith refusal" case has the burden of proving:
> (a) an insurance contract between the parties and a breach thereof by the defendant;
> (b) an intentional refusal to pay the insured's claim;
> (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
> (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
> (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
> In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.

*Id*. at 183.

The undisputed evidence establishes that the plaintiff made several material misrepresentations causing the policy to be voided. As a result, the plaintiff is unable to satisfy the most basic element of a bad faith claim: breach of the insurance contract.

## Conclusion

Wherefore, based on the foregoing, the motion for summary judgment is due to be granted as to the breach of contract claim and the bad faith claim. An appropriate judgment for the defendant will be entered.

DONE this 19th day of September, 2008.

*/s/ Robert R. Armstrong*
Robert R. Armstrong, Jr.
United States Magistrate Judge